UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JAN 1 7 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civ. A. No. 98-893 (RCL) |
| DANIEL R. GLICKMAN, Secretary of Agriculture, et al., | ) ) ) |
| Defendants. | ) ) |

<u>MEMORANDUM AND ORDER</u>

This matter is once again before the Court.  In the first disposition of this case, the Court granted the defendants' motion for summary judgment.  The plaintiffs appealed and the Court of Appeals reversed and remanded the case for further proceedings consistent with the reversal opinion.  Now before the Court are two motions.  The plaintiffs move for entry of a remedial order consistent with the Court of Appeals' decision.  The defendants move for a judgment declaring that the agency action under dispute is not in violation of either the Court of Appeals' decision or any relevant federal statute.  After considering the parties' memoranda, the Court of Appeals' opinion, and for the following reasons, the Court GRANTS the plaintiffs' motion for a remedial order as set forth herein and GRANTS the defendants' motion.

52

**BACKGROUND**

The United States Department of Agriculture (the "USDA") is charged with inspecting our nation's meat supply.[1]  Two statutes accomplish this charge: the Federal Meat Inspection Act and the Poultry Products Inspection Act.  The statutes, which both use similar wording, require the Secretary of Agriculture to cause "inspectors" to conduct a "post-mortem examination and inspection" of each animal carcass.  *See* Federal Meat Inspection Act, 21 U.S.C. § 604; Poultry Products Inspection Act, 21 U.S.C. § 455(b).

For most of the previous century, the USDA fulfilled its statutory duties by having inspectors from its Food Safety and Inspection Service ("FSIS") perform "organoleptic" inspections on each individual animal carcass.  Organoleptic inspections involve an examination using traditional human senses, such as sight, touch, or smell.  In 1996, however, the USDA endeavored to change this method of inspection.

Instead of having one of its FSIS inspectors perform each organoleptic inspection, the USDA required meat processors to share in the inspection duties.  Under this arrangement, the processors would perform the organoleptic inspections themselves, and the FSIS inspectors would monitor the processors to ensure that they were complying with the inspection requirements.

---

[1]    For ease of reference, the Court uses the term "meat" to refer collectively to poultry and pork, the two foods apparently being subjected to the disputed inspection programs.

FSIS's oversight in this regard ranged from observing the processor employees as they inspected the carcasses to performing random organoleptic inspections of individual carcasses.

In 1998, the American Federation of Government Employees ("AFGE") argued in this Court that the USDA exceeded its *Chevron* authority in promulgating the new inspection program. AFGE contended that the federal inspection statutes require FSIS inspectors to personally inspect each and every carcass organoleptically, not just to oversee others performing such a task. On September 23, 1999, this Court disagreed. The Court reasoned that the word "inspection," as used in the applicable statutes, does not "mandate[] a direct, physical examination of each carcass." *AFGE v. Glickman*, Sept. 23, 1999, slip op. at 3 ("AFGE I"). Thus, the Court found the USDA's inspection program to be a "rational policy judgment that lie[d] well within the Secretary [of Agriculture's] discretion [under *Chevron*.]" *Id.*

AFGE appealed. The Court of Appeals reversed this Court's holding and remanded the case for further proceedings. *See AFGE v. Glickman*, 215 F.3d 7 (D.C. Cir. 2000) ("AFGE II"). The Court of Appeals reasoned that, under the FSIS's inspection program, government inspectors were "inspecting people not carcasses," and thus were in violation of their unambiguous statutory duties. *Id.* at 11.

In response to the Court of Appeals' decision, the USDA modified its inspection programs. While the new inspection

3

programs differ somewhat according to the type of meat (i.e.,
poultry or pork), the essential elements of the programs are
similar, and can be summarized as follows:

    1.    At least one FSIS inspector, a "carcass" inspector, is
stationed on each slaughter line and is responsible for
examining each carcass to determine if it is
adulterated.  The carcass inspector is preceded on the
line by industry inspectors who perform a preliminary
organoleptic inspection.

    2.    One "verification" inspector is assigned to each
slaughter line.  This inspector does not have a fixed
position on the line, but continuously "floats" in
order to fully evaluate the processor's inspection
efforts.  The verification inspector also samples
carcasses from each line to detect food safety defects,
selects carcass samples for microbiological testing,
and reviews plant inspection records.

    3.    All FSIS inspectors have the authority to stop or slow
the production line, retain carcasses, withhold marks
of inspection, and reject facilities or equipment that
are not in compliance with regulations.[2]

*See* Declaration of Michael J. Grasso (Project Manager of FSIS's
new inspection programs), Sept. 15, 2000, *passim* [hereinafter
Grasso Declaration].

AFGE objects to this inspection program.  It asserts that,
under this program, "federal inspectors do not subject each
carcass to the close examination and critical appraisal required
by law."  Brief for Plaintiff, Sept. 26, 2000, at 1.  The USDA
defends the new inspection program by asserting that the chief

_____

    [2]    By way of comparison, the inspection program which the
Court of Appeals struck down contained no carcass inspectors.
FSIS inspectors served either in an oversight capacity (by
observing industry inspectors during their organoleptic
inspections) or a verification capacity (by sampling inspected
carcasses from the slaughter line). *See AFGE II*, 215 F.3d at 10.

4

error of the old program--that FSIS inspectors were "inspecting people not carcasses"--has been corrected.  Under the new program, argues the USDA, FSIS inspectors are now "observing directly each carcass to determine whether or not it is adulterated."  Brief for Defendant, Oct. 20, 2000, at 2-3.  *See also* Grasso Declaration at 2, 8 ("The inspector positioned on the [poultry] slaughter line . . . will be responsible for examining each carcass and for determining whether the carcass is adulterated. . . . [As well, with respect to the pork plants, the inspection program will] ensure that the head, viscera, and carcass of each swine slaughtered is inspected by an FSIS inspector.").

The Court now considers whether the USDA's latest inspection program is permissible.

## ANALYSIS

### I.    Standard of Review

This case implicates the rule of deference promulgated in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  *Chevron* requires a court to analyze agency action under a two-step analysis.  "First, always, is the question of whether Congress has directly spoken to the issue.  If the intent of Congress is clear, then that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id*. at 841.  If,

5

however, the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [final action] is based on a permissible construction of the statute."  *Id.*  A construction is permissible if it is reasonable.  The agency's construction, however, need not be the only or most reasonable interpretation, *see id.* at 843 n.11,  it must merely be "rational and consistent with the statute."  *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123 (1987).  *See also General Elec. Co. v. United States Envtl. Protection Agency*, 53 F.3d 1324, 1327 (D.C. Cir. 1995).


**II.   The FSIS Inspection Program**

This case turns on the meaning of the word "inspection." Although declaring the word to be unambiguous, the Court of Appeals actually failed to define the term.  Instead of tackling the essence of the dispute--that is, what must the USDA do to satisfy its inspection duties--the Court decided the relatively narrow question of whether FSIS inspectors can satisfy their duty to inspect by observing others doing the inspecting.  The following excerpt contains the heart, and almost the entirety, of the Court of Appeals' analysis:

> Both statutes clearly contemplate that when inspections are done, it will be federal inspectors--rather than private employees--who will make the critical determination whether a product is adulterated or unadulterated.  To the extent federal employees are doing any systematic inspecting under the [inspection program] they are inspecting people not carcasses.  Delegating the task of inspecting carcasses to

6

> plant employees violates the clear mandates of the
> [inspection statutes].

*AFGE II*, 215 F.3d at 11..  Thus, while the Court of Appeals has
held that FSIS employees must personally inspect each and every
carcass, it is still unclear--over 2 years from the start of this
litigation--what exactly the FSIS employees must do.  Thus, this
Court will now consider the issue for the second time.

In considering the issue at this point in the litigation,
two questions present themselves for the Court's review:
(1) whether the current inspection program violates the Court of
Appeals' opinion, and (2) whether the current inspection program
satisfies the USDA's inspection duties under the meat inspection
statutes.

> A.   The Inspection Program Under the Court of Appeals
>      Opinion

After a careful review, the Court finds that the USDA's
current inspection program is not violative of the Court of
Appeals' June 30, 2000 Opinion.  The Court of Appeals held that
the USDA must not abdicate in its duty to personally inspect each
and every carcass.  In the case at hand, there is no dispute that
"federal inspectors--rather than private employees-- . . . . are
mak[ing] the critical determination whether a product is
adulterated or unadulterated."  *AFGE II*, 215 F.3d at 11.
According to the persuasive testimony of Michael Grasso, project
manager for the new inspection program, each slaughter line
contains at least one FSIS employee who makes the final
determination whether each and every carcass slated for human

consumption is unadulterated.[1]  *See* Grasso Declaration at 2, 8.

The plaintiffs argue that, even if FSIS inspectors are making the *final* adulteration decision, the USDA is in violation of the Court of Appeals' decision because it is requiring private employees to make *preliminary* adulteration decisions.  Thus, argue the plaintiffs, the defendant has impermissibly delegated some of its inspection duties.  This argument is unpersuasive for two reasons.

First of all, the main thrust of the Court of Appeals' decision is not that delegation of inspection duties is impermissible, but that the FSIS cannot satisfy its inspection duties by merely observing others perform inspections.  Thus, the court ruminated metaphorically on how "watching others perform the task [of inspection]" fails to fulfill the statutory duty to *do* the task:

---

[1]     The plaintiffs attempt to rebut Mr. Grasso's declaration in this respect by arguing that the FSIS inspectors are merely "observing" and not "inspecting" the carcasses.  In this respect, the plaintiffs assert that inspectors stand "approximately four feet" from the slaughter line and, in some cases, up to ten feet from the slaughter line.  *See* Declaration of John Franco, Nov. 8, 2000.  Further, the plaintiffs claim that the line speeds are excessive and that inspectors do not have the authority or capability to halt the slaughter line if a defect should be detected.  *See generally* Declarations of Alvin Sewell, Eldon Sharpley, and Joseph Ferguson.  Although these assertions are directly rebutted by the defendants, *see generally* Grasso Declaration; Declaration of Alan Oser, Dec. 18, 2000, the Court need not delve into the particularities of line speeds and inspector positioning.  As explained further in section II.B., *infra*, these details of the inspection process are within the discretion of the agency to control.  *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837 (1984).

> One might as well say that umpires are pitchers because they carefully watch others throw baseballs. . . . Every inspection involves an observation, but not every observation amounts to an inspection.  One may observe something without paying close attention to it, and without giving it a critical appraisal, although that is what these statutes demand.  The military commander may observe his troops without inspecting them.  The foreman of an assembly line may do the same with widgets.

*AFGE II*, 215 F.3d at 10-11.  Thus, the best interpretation of the Court of Appeals' decision is not that delegation is wholly impermissible, but that the defendant bears the affirmative duty to do more than observe.[4]  The current program fulfills that duty, and any delegation involved does nothing to change this.

Second of all, interpreting the Court of Appeals' decision to prohibit any delegation would cause absurd results.  Such a reading would suggest that FSIS inspectors must make *every* adulteration decision and must *forbid* private employees from making *any* adulteration decision, no matter how obvious.  Under a program so devised, a private employee seeing a carcass crawling with maggots must not remove the carcass from the slaughter line, but must hope that the FSIS inspector stationed down the line

---

[1]    The Court is aware of the Court of Appeals' statement that "Delegating the task of inspecting carcasses to plant employees violates the clear mandates of the inspection statutes."  *AFGE II*, 215 F.3d at 11.  In light of the above block quote, it would be incorrect to interpret this quote as speaking to the issue of delegation.  One could easily rephrase the sentence without changing the meaning at all: "By merely observing plant employees inspecting carcasses, the FSIS inspectors violate the clear mandates of the inspection statutes."  Thus, the heart of the Court of Appeals' analysis is not about who inspects the carcasses, but about whether an observation amounts to inspection.

(who is, after all, human) will catch the adulteration.  This
would be an absurdity of both safety and interpretation.  The
bottom line in this case is that an FSIS inspector personally
inspects each and every carcass leaving the slaughter line.  The
fact that private employees pare this carcass quantity down by
removing some adulterated carcasses does nothing to change this.

    B.    The Inspection Program Under the Meat and Poultry
            Statutes

    In the Court's opinion, the USDA's inspection program
satisfies the requirements of the federal meat and poultry
inspection statutes.  With all due respect to the Court of
Appeals' declaration that the word "inspection" is not ambiguous,
this Court must declare that, at one level, the word is
*absolutely* ambiguous.  The plaintiffs demonstrate this by harping
on the fact that, under the disputed inspection program, the FSIS
inspectors do not examine, inter alia, the urinary systems of the
chicken carcasses.  *See* Brief for Plaintiffs, Sept. 26, 2000, at
3-4 (citing USDA-FSIS-OPHS Eastern Laboratory Pathology Report,
Serial No. 070983).  This, they argue (with the support of a
treatise on meat hygiene), should persuade the Court that the
defendants are not properly "inspecting" the carcasses.  In other
words, the plaintiffs--who are fully invoking the Court of
Appeals' decision that "inspection" is not ambiguous, are arguing
that Congress--by requiring FSIS employees to conduct a "post
mortem inspection" of each bird--has spoken to the issue of
whether the USDA must inspect the urinary systems of dead

10

chickens.  This Court cannot agree.

Using the "traditional tools of statutory construction," in fact, using *any* tool of statutory construction, the Court cannot conclude that "Congress has directly spoken to the issue" of whether the urinary systems of chicken carcasses should be inspected.[5]  *Chevron*, 467 U.S. at 842.  If the Court of Appeals can, consistent with its proclamation of unambiguity, elucidate the "expressed intent of Congress" in this regard, then this Court will dutifully obey.  *Id*. at 843.  But until then, the word "inspection" must be considered ambiguous with respect to the scope of the inspection.[6]

Given the ambiguity of the statutes in regard to the scope of the inspection, the Court concludes that the USDA's new inspection program is a reasonable interpretation of the statutes.  An FSIS inspector personally inspects each and every carcass that leaves the slaughter line.  *See* Grasso Declaration

---

[5]     This example is echoed by another of the plaintiffs' grievances with the new inspection program.  The plaintiffs argue that the FSIS is disobeying its statutory mandate of "inspection" by viewing chickens at line speeds of up to 215 carcasses per minute.  See Declaration of Alvin Sewell, Sept. 26, 2000.  Similar to its analysis of the urinary system argument, the Court cannot conclude that Congress has spoken to the precise issue of line speeds at poultry processing plants.

[6]     The Court refers to the *scope* of the inspection intentionally.  By declaring the term "inspection" ambiguous in this sense, the Court is not flouting the Court of Appeals' decision that "inspection" is unambiguous in other respects.  On the facts of the present dispute, it is impossible for the Court to fully accept Court of Appeals' broad declaration of unambiguity.

at 2, 8.  Despite this unavoidable fact, the plaintiff argues
that excessive slaughter line speeds and lack of attention to the
chickens' viscera (or entrails) renders the inspection deficient
as a matter of law.  In this respect, the plaintiffs urge the
Court that an

> accurate diagnosis of systematic disease and its particular
> pathologic manifestations requires examination of tissues
> with gross lesions as well as tissues comprising the major
> organ systems (cardiopulmonary, urinary, lymphoid,
> intestinal, etc.).

Brief for Plaintiffs, Sept. 26, 2000, at 4.

Terms such as "pathological manifestations", "gross
lesions", and "slaughter line speeds"--which the plaintiffs use
routinely in their pleadings--make clear to the Court the
correctness of its decision.  Article III courts cannot, *and
should not*, attempt to evaluate an inspection system in such a
technical and detailed fashion.[7]  To do so would be to defy the
edict of *Chevron*, which guarantees to agencies a zone of
discretion within which to exercise their expertise.  The Court
cannot find in this case that the defendants are acting outside
of this zone.  Perhaps, if costs were not a factor, the USDA

---

[7]     Even if the Court saw it fit to enter into the
scientific nuances of inspecting chicken entrails, there is
substantial evidence that the USDA's decision is correct.  For
example, on the issue of inspecting chicken viscera, Mr. Grasso
testifies that such an inspection is not important to an
effective inspection.  *See* Grasso Declaration at 7.  Mr. Grasso
explains that the only virus that could be detected with such an
inspection is "avian visceral leukosis," which is "not
transmissible to humans."  *Id*.  The plaintiffs fail to rebut this
assertion in any fashion.

could make its inspections more rigorous.  But even if that were the case, the Court's decision today would not change.  The defendants' current inspection program need not be the most reasonable one, or even the only reasonable one.  *See Chevron*, 467 U.S. at 843, n.11.  Rather, the inspection program need only be reasonable, which the Court finds it to be.[8]

### CONCLUSION

For all of the foregoing reasons, it is hereby

ORDERED that the plaintiffs' motion for entry of a remedial order and the defendants' motion for a declaratory judgment are GRANTED as set forth herein; further, it is

DECLARED and DECREED that inasmuch as the defendants' inspection program omits a personal inspection of each carcass by an FSIS inspector, it is in violation of the Court of Appeals decision in *AFGE v. Glickman*, 215 F.3d 7 (D.C. Cir. 2000) and either the Federal Meat Inspection Act, 21 U.S.C. § 604, or the Poultry Products Inspection Act, 21 U.S.C. § 455(b); further, it is

---

[8]    As a final note, the Court declines to permit the plaintiffs further discovery as informally requested in their final brief.  *See* Brief for Plaintiff, Nov. 14, 2000, at 4.  Further discovery would only prolong the instant dispute, and denying further discovery does not prejudice the plaintiffs in any way.  The lack of prejudice arises from the fact that the plaintiffs have excellent seats from which to view the behavior of the FSIS inspectors.  Thus, if the federal inspectors fail to fulfill their statutory duty to inspect the carcasses, the plaintiffs do not need discovery to provide such evidence.

DECLARED and DECREED that the defendants' current inspection program, known as the HACCP-Based Inspection Models Project and described in the Declaration of Michael J. Grasso, Jr., Sept. 15, 2000, does not violate the Court of Appeals' Opinion in *AFGE v. Glickman*, 215 F.3d 7 (D.C. Cir. 2000) and does not violate the Federal Meat Inspection Act, 21 U.S.C. § 604, or the Poultry Products Inspection Act, 21 U.S.C. § 455(b).

SO ORDERED.

Date: _1- 17- 01_            _Royce C. Lamberth_
                            ROYCE C. LAMBERTH
                            UNITED STATES DISTRICT JUDGE